# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JUAN HERRERA and MARIA HERRERA,<br><br>　　　　　　　　　　　　Plaintiffs,<br>　　vs.<br>UNITED STATES OF AMERICA,<br>　　　　　　　　　　　　Defendant. | CASE NO. 09cv0756 JM(WMc)<br><br>ORDER GRANTING MOTION TO DISMISS AND FOR SUMMARY JUDGMENT |

Defendant United States of America moves to dismiss this Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§1346(b)(1) and 2671 et seq., for lack of subject matter jurisdiction and for summary judgment. Plaintiffs Juan and Maria Herrera oppose the motion. Pursuant to Local Rule 7.1(d)(1), this matter is appropriate for decision without oral argument. For the reasons set forth below, the court grants the motion to dismiss and for summary judgment in favor Defendant and against Plaintiffs. The Clerk of Court is instructed to enter judgment accordingly and to close the file.

**BACKGROUND**

On April 14, 2009 Plaintiffs commenced this action by filing a FTCA complaint alleging a single claim for negligence. Plaintiffs' claims arise from a July 26, 2007 automobile accident on State Route 2 ("S-2"). (Compl. ¶18). Plaintiffs allege that at about 4:20 p.m. agents for the U.S. Border and Customs Protection observed a 1994 Dodge Dakota pickup truck traveling north on S-2. The agents believed that the Dodge Dakota, driven by Daniel Lopez, contained illegal immigrants.

1  The agents attempted to stop the Dodge Dakota but it did not yield and the agents pursued the Dodge
2  Dakota in unmarked service vehicles. (Compl. ¶19).

3  In an attempt to stop the vehicle allegedly traveling at a high rate of speed, agents deployed
4  tire deflation devices, allegedly deflating at least one tire. (Compl. ¶21). Plaintiffs allege that the
5  agents pursued the Dodge Dakota at a high rate of speed when the pickup crossed into the southbound
6  lanes of S-2 and struck the Toyota Corolla driven by Plaintiffs, severely injuring them. (Compl. ¶24).
7  Two individuals in the Dakota sustained fatal injuries. (Compl. ¶26). As a result of the accident, the
8  driver of the Dakota was convicted of murder in state court and is currently serving a 33-year
9  sentence.

10  The parties have conducted extensive discovery. The Government now moves to dismiss all
11  claims, and for summary judgment, under the discretionary function exception of the FTCA, arguing
12  that the discretionary function exception bars Plaintiffs' claims. Plaintiffs oppose the motion largely
13  on the ground that material genuine issues of fact prevent the grant of summary judgment under
14  Fed.R.Civ.P. 56.

15  **DISCUSSION**

16  **Legal Standards**

17  Motion for Summary Judgment

18  A motion for summary judgment shall be granted where "there is no genuine issue as to any
19  material fact and . . . the moving party is entitled to judgment as a matter of law." FED. R. CIV. P.
20  56(c); Prison Legal News v. Lehman, 397 F.3d 692, 698 (9th Cir. 2005). The moving party bears the
21  initial burden of informing the court of the basis for its motion and identifying those portions of the
22  file which it believes demonstrates the absence of a genuine issue of material fact. Celotex Corp. v.
23  Catrett, 477 U.S. 317, 323 (1986). There is "no express or implied requirement in Rule 56 that the
24  moving party support its motion with affidavits or other similar materials negating the opponent's
25  claim." Id. (emphasis in original). The opposing party cannot rest on the mere allegations or denials
26  of a pleading, but must "go beyond the pleadings and by [the party's] own affidavits, or by the
27  'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that
28  there is a genuine issue for trial.'" Id. at 324 (citation omitted). The opposing party also may not rely

solely on conclusory allegations unsupported by factual data. Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989).

The court must examine the evidence in the light most favorable to the non-moving party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962). Any doubt as to the existence of any issue of material fact requires denial of the motion. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). On a motion for summary judgment, when "'the moving party bears the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence were uncontroverted at trial.'" Houghton v. South, 965 F.2d 1532, 1536 (9th Cir. 1992) (emphasis in original) (quoting International Shortstop, Inc. v. Rally's, Inc., 939 F.2d 1257, 1264-65 (5th Cir. 1991), cert. denied, 502 U.S. 1059 (1992)

The FTCA

The FTCA provides "a limited waiver of sovereign immunity for certain torts of federal employees acting within the scope of their employment." United States v. Orleans, 425 U.S. 807, 813-14 (1976). The burden of establishing waiver rests with the party asserting jurisdiction. Holoman v. Watt, 708 F.2d 1399, 1401 (9th Cir. 1983).

The FTCA waives sovereign immunity for injuries "caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office of employment." 28 U.S.C. §1346(b). However, the FTCA preserves sovereign immunity for any "claim based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. §2680(a). If the alleged tort arises from discretionary conduct, a court lacks subject matter jurisdiction over the claim. Bibeau v. Pac. NW. Research Found, Inc., 339 F.3d 942, 945 (9th Cir. 2003).

The Supreme Court instructs that the court is to apply a two-part test for the application of 28 U.S.C. §2680(a). First, the court determines whether the conduct at issue violated a mandatory regulation or policy that allowed no judgment or choice in the employee. Bibeau, 339 F.3d at 945. The discretionary function exception does not apply "if a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow." United States v. Gaubert, 499

1  U.S. 315, 322-23 (1991). Second, the "court must determine whether that judgment is of the kind that
2  the discretionary function exception was designed to shield." <u>Berkovitz v. United States</u>, 486 U.S.
3  531, 536 (1991). In other words, if there is no mandatory regulation or statute involved, the court asks
4  "whether the conduct was susceptible to being based upon social, economic, or political policy."
5  <u>Bibeau</u>, 339 F.3d at 945. "Where there is room for policy judgment and decision there is discretion"
6  of the sort protected by 28 U.S.C. §2680(a). <u>Berkovitz</u>, 486 U.S. at 537; <u>Weissich v. United States</u>,
7  4 F.3d 810, 814 (9th Cir. 1993). In analyzing the discretionary function exception, the court must be
8  mindful that "[t]he basis for the discretionary function exception was Congress' desire to 'prevent
9  judicial second-guessing of legislative and administrative decisions grounded in social, economic, and
10 political policy through the medium of an action in tort." <u>Id</u>. at 536-37.

**Applicability of the Discretionary Function Exception**

There are two relevant policies at issue: the Border Patrol Pursuit Policy ("Pursuit Policy") and the Controlled Tire Deflation Device Policy ("CTDD Policy"). (Ramos Decl., Exh. A, Attts. 1 and 2). Each is discussed in turn.

<u>The Border Patrol Pursuit Policy</u>

First, the court considers the existence of any mandatory regulation or policy prescribing the underlying conduct at issue. "Conduct cannot be discretionary unless it involves an element of judgment or choice." <u>Berkovitz</u>, 486 U.S. at 536. Where the policy "allows room for implementing officials to make independent policy judgments, the discretionary function exception protects the acts taken by those officials in the exercise of this discretion." <u>Weissich v. United States</u>, 4 F.3d 810, 814 (9th Cir. 1983).

The purpose of the Pursuit Policy is to establish "guidelines set[ting] forth the terms and conditions which will guide Border Patrol Agents in deciding when to engage in, continue and/or terminate a vehicle pursuit in order to minimize the possibility of injury or death to border Patrol Agents, general public and suspects." (Bates 8). The policy expressly acknowledges that the "policy of the Border Patrol [is] to protect all persons to the extent possible when enforcing the law." To accomplish that policy "<u>it shall be the policy of the Border Patrol that vehicle pursuits begin and continue only when the agent involved believes that the pursuit can be done with reasonable safety</u>."

1  (Emphasis in original). (Bates 11). The policy then identifies numerous factors that influence an agent's decision to commence, continue, or terminate a pursuit: the performance capabilities of the pursuit vehicle, the suspect vehicle, the nature of the violation, the suspect's characteristics, the agent's characteristics, roadway surface conditions (gravel, dirt, pavement, etc.), roadway characteristics (straight level, grade, curve, etc.), location of pursuit and traffic conditions, time of day, weather conditions, and the communications capabilities of the agents (collectively "Safety Factors"). (Bates 11-12).

By its very nature, the court concludes that the Pursuit Policy vests agents with significant discretion in choosing where, when, how, and to what extent to commence, continue, and terminate the pursuit of fleeing vehicles. The policy identifies numerous Safety Factors to be considered when the agent exercises judgment. (Bates 11-12). The often complex circumstances and variables surrounding a pursuit necessarily require the agent or agents to continually analyze rapidly changing circumstances (roadway conditions and characteristics, traffic conditions, weather conditions, vehicle characteristics, etc., as set forth in the Pursuit Policy), when deciding to commence, continue, or terminate a pursuit. The court further notes that the Pursuit Policy does not provide objective hard and fast rules to determine when to conduct or continue a pursuit of a fleeing vehicle. As set forth in the Pursuit Policy, an agent is required to consider eleven Safety Factors, many of those with subparts, in determining whether to commence, continue, or terminate a pursuit. (Bates 11-12). Furthermore, in setting forth the Safety Factors, the Pursuit Policy specifically highlights: "Due to the subjective nature of [] this policy, the good common sense and sound judgment of the agent involved is vital." (Bates 12). Accordingly, the court concludes that the Pursuit Policy vests substantial discretion in Border Patrol Agents and that the Pursuit Policy provides no specific directives that mandate specific action when pursuing fleeing vehicles.

The next issue is whether the decision is susceptible to a policy analysis grounded in social, economic, or political concerns. Berkovitz, 486 U.S. 531; Miller v. United States, 163 F.3d 591, 595 (9th Cir. 1998). As noted in Gaubert, "if a regulation allows the employee discretion, the very existence of the regulation creates a strong presumption that a discretionary act authorized by the regulation involves consideration of the same policies which led to the promulgation of the

1 regulations." 499 U.S. 324. Gaubert also instructs that the focus of the inquiry is not on the agent's
2 subjective intent in exercising discretion but on the nature of the actions taken and on whether they
3 are "susceptible to policy analysis." Id. at 325. Here, the court concludes that the Pursuit Policy is
4 firmly grounded on public policy. Decisions concerning whether to initiate, continue, or terminate
5 a pursuit implicate competing policies. On the one hand, "law enforcement agents have a mandatory
6 duty to enforce the law," Horta v. Sullivan, 4 F.3 2, 21 (1st Cir. 1993), which must be balanced against
7 the safety concerns of the general public as well as minimizing economic losses and political concerns.
8 See Weissich, 4 F.3d at 8 (holding that a probation officer's duty to promote the rehabilitation of a
9 probationer while minimizing harm to the public necessarily "involves policy decisions on matters
10 such as public safety, allocation of scarce resources, and the likelihood of rehabilitation).
11 Accordingly, this prong of the discretionary function exception is satisfied.

12 Having concluded that the two-part test is satisfied with respect to the Pursuit Policy, 28
13 U.S.C. §2680(a) bars any claims whether or not negligence or other tortious conduct is involved. See
14 Kennewick Irrigation Dist. v. Untied States, 880 F.2d 1018,, 1029 (9th Cir. 1989) ("[n]egligence is
15 simply irrelevant to the discretionary function inquiry"). Consequently, as Plaintiffs allege that the
16 United States acted negligently in failing to comply with the Pursuit Policy, that claim is barred by
17 the discretionary function exception to the FTCA.

18 In sum, the court finds that Plaintiffs' claims are barred by the discretionary function exception
19 to the FTCA.[1]

20 <u>The CTDD Policy</u>

21 The purpose of the CTDD Policy is "to establish standards for the safe and proper deployment
22 of the" CTDD.[2] (Bates 23). The overriding guideline for the CTDD Policy provides: "the immediate
23 or potential danger to the public created by the deployment of the CTDD shall be less than the
24 immediate or potential danger to the public should the suspect vehicle be allowed to proceed without

---

[1] Even if the discretionary function exception did not apply, Defendant is entitled to summary judgment. The evidence submitted by Plaintiffs, as discussed below, fails to raise a genuine issue of material fact that the agents violated either the Pursuit Policy or the CTDD policy.

[2] The CTDD used by the Border Patrol is a Stinger-brand CTDD, which is designed to prevent blowouts by deflating a tire in a regulated manner. (Bates 48-52).

deployment of the CTDD." (Bates 24). Furthermore, "[t]he officer retains discretion not to deploy the CTDD and should not do so if safety concerns are an issue." <u>Id.</u> The CTDD Policy provision relied upon by Plaintiffs to establish a mandatory provision provides:

> 7.8 The road where a CBP Officer is considering the deployment of a CTDD should provide an unimpeded view of vehicular traffic from all directions. The CTDD may be used only in areas where topography, roadway surfaces, and vehicular conditions indicate that deployment can be accomplished with reasonable safety. A level section of the roadway that provides the deploying officer some type of safety barrier should be selected where possible.

(Bates 26).

The court concludes that these provisions vest agents with substantial discretion and do not impose on officers deploying CTDD devices mandatory duties to deploy the device in any particular manner. The policy uses language indicating that the agent possesses discretion to deploy the CTDD and "should" be deployed where there is an unimpeded view of the traffic. However, although not cited by the parties, the CTDD Policy does impose some mandatory restrictions on the use of CTDDs:

### 8. **RESTRICTIONS**

> 8.1 The CTDD <u>shall not</u> be deployed in school zones or in cases when the danger to the public outweighs the enforcement benefit. A CBP Officer shall not overtake a pursued vehicle in order to deploy a CTDD. A CBP Officer shall comply with any other restrictions as noted by the manufacturer of the CTDD being deployed. (Emphasis in original).

(Bates 26). The use of the mandatory "<u>shall not</u>" language in the policy does not authorize agents to exercise discretion. The court notes that three of the four identified restrictions do not apply to the present case (a CTDD shall not be deployed in school zones, an officer shall not overtake a pursued vehicle to deploy the device, and an officer shall comply with the manufacture's restrictions). However, one of these mandatory restrictions arguably applies under the circumstances: "The CTDD <u>shall not</u> be deployed . . . in cases when the danger to the public outweighs the enforcement benefit." <u>Id.</u> The court notes a contradiction with this provision in that it applies mandatory language, <u>shall not</u>, to a balancing test, by applying the term "outweighs," which indicates a degree of discretion. Use of the term "outweighs" indicates that an agent is to balance the totality of the circumstances against the potential for harm to the public and the agent's safety.

In light of the discretionary authority given to agents to determine whether "the danger to the public outweighs the enforcement benefit," (Bates 26), the court concludes that this policy "allows

1  room for implementing officials to make independent policy judgments [such that] the discretionary
2  function exception protects the acts taken by those officials in the exercise of this discretion."
3  Weissich, 4 F.3d at 814. Accordingly, the court concludes that this policy provision, as applied to the
4  present circumstances, is not a mandatory policy as it vests the agent with substantial discretion in
5  determining whether to deploy a CTDD.

6  The court also concludes that the second consideration of Berkovitz is satisfied for the same
7  reasons as the Pursuit Policy. That is, the underlying conduct is based upon social, economic, or
8  political policy. As with the Pursuit Policy, the policy seeks to balance competing law enforcement
9  policies against the safety concerns of the general public as well as to minimize economic losses and
10 political concerns. Accordingly, 28 U.S.C. §2680(a) bars any claims based upon negligence.

11 In sum, the court concludes that Plaintiffs' claims are barred by the discretionary function
12 exception to the FTCA.

13 **The Evidentiary Motion**

14 Even if the discretionary function exception did not apply, the Government is entitled to
15 summary judgment on Plaintiffs' negligence claim. The Government has come forward with
16 substantial unrebutted evidence to show that the CTDD was never deployed, and therefore there was
17 no violation of any CTDD policy, and that the agents terminated pursuit of the vehicle prior to the
18 accident, and therefore there was no violation of the Pursuit Policy.

19 The largely undisputed evidence establishes that on June 26, 2007 a Border Patrol team known
20 as COBRA decided to patrol Highway S-2 because intelligence reports indicated that alien smugglers
21 had been using that road. (Ramos Depo, Exh. C, 74:15-75:7). All the agents were dressed in
22 plainclothes and driving unmarked vehicles (except Agent Hubal). (Ramos Decl. ¶4). The agents
23 determined where each agent would be stationed, and what role each agent would be assigned. (Id.
24 82:9-18; 86:18-89:21).

25 At about 4:00 p.m., Agent Salazar, the southern most agent performing surveillance duties of
26 vehicles traveling on S-2, (Salazar Depo., Exh. D, 40:25-41:9), observed two suspicious vehicles, one
27 of which was the red Dodge pickup driven by Lopez. It was determined that Agent Acosta would
28 investigate the Dodge. Agent Acosta pulled behind the Dodge, which had pulled over to the side of

the road, and activated his emergency lights. As Agent Acosta exited the car, the Dodge fled. The agents then commenced pursuit. At that time, the Dodge was in the proper lane, going an average speed for traffic on S-2, a 55 MPH zone. (Cortes Depo., Exh. F, 56:15-20). Agent Cortes, the driver of the vehicle closest behind the Dodge, never came within about a quarter mile of the pickup. (Id. at 61:21-24).

Agent Joanicot, who was stationed near marker 47 and north of the Dodge on S-2, (Joanicot Depo., Exh. G, 35:25-36:23), then observed the Dodge coming over a hill and approach his position. As Agent Joanicot waited to deploy the CTDD, the Dodge then swerved in his direction twice, once at about 70 yards away and again at 15-20 feet. He sought to deploy the CTDD but aborted the deployment when he jumped back to avoid the Dodge swerving towards him. (Id. at 53:1-15). As Agent Joanicot ran to avoid being hit by the Dodge, he pulled the CTDD out of the lane of traffic. The CTDD did not deploy, and the Dodge continued northbound on S-2.

Supervisor Ramos, who was stationed near mile marker 45 (Plaintiff seeks to controvert this evidence with the deposition testimony of Lopez, discussed below), heard a radio transmission to the effect of "negative spike." (Ramos Depo, Exh. C, 112:22-113:1). A few moments later, to protect himself, Agent Ramos positioned himself in front of his vehicle at about marker 45 on the east side of the road with the pull cord extended across the road and the CTDD on the west shoulder of S-2. Agent Ramos had not yet determined whether to deploy the CTDD, but when the Dodge approached traveling about 60 to 65 MPH, he observed it straddling the double-yellow line and swerving. (Id. at 128:20-129:5). Agent Ramos believed that the Dodge was driving in the middle of the highway because he was trying to determine exactly where the spike strip was deployed or would be deployed. (Id. at 129:1-5). Agent Ramos then decided that it would not be safe to deploy his CTDD, and released the cord. As the Dodge passed over the cord, but not the CTDD, it got caught under the Dodge, which dragged the CTDD about five yards from where it was deployed. A few minutes later, Agents Cortes and Acosta passed Agent Ramos with lights and siren on. Supervisor Ramos then radioed the agents to terminate the pursuit. Agent Cortes and Acosta had just passed Agent Ramos' location when they turned off their lights and sirens, slowed down, and pulled over to the side of the road. (Acosta Depo., Exh. 46:23-48:7; Cortes Depo., Exh. F 87:17-89:4). The agents stopped the pursuit within about a

1  quarter mile of mile marker 45. (Cortes Depo. at 46:13-16). The accident occurred near mile marker
2  42, a little less than three miles from where Agent Ramos was located (subject to a purported factual
3  dispute, discussed below), and two miles from where Agents Acosta and Cortes terminated the pursuit.
4  At the time Agent Cortes terminated the pursuit, he was about one-quarter mile behind the Dodge,
5  near mile marker 45. (Cortes Exh. F 88:21-24).

6  To briefly summarize the Government's evidence, Agent Ramos did not deploy the CTDD and
7  the agents discontinued the pursuit about three miles before the accident. Under these circumstances,
8  absent a disputed genuine issue of material fact, no violation of the Pursuit or CTDD Policy occurred.

9  In an effort to raise a genuine issue of material fact, Plaintiffs come forward with the
10 deposition testimony of Lopez in an attempt to controvert the Government's factual assertions and
11 evidence. Lopez testified that he observed a vehicle alongside a curve right before the site of the
12 accident. The curve immediately preceding the accident site is located between mile markers 42 and
13 43. (Lopez depo 50:9-22: 54: 18-24). Lopez saw an individual by the side of the road, (Id. at 52:12),
14 and a parked vehicle, which he could not identify by color or body style. (Id. at 75:17). He did not
15 see a spike strip in the road nor did he observe anyone deploy a spike strip. (Id. at 111:8-11). Lopez
16 also testified that as he exited the curve, he "felt the tires popping." (Id. at 50:13-19). He also
17 testified that he did not hear the tires "pop," he only "felt the tires." (Id. at 121:11-14). When asked
18 why his tires went flat, Lopez responded that he "imagined" that "they [the agents] had flatted them."
19 When asked why he imagined that, Lopez responded "Because I live on the border. I see what goes
20 on on the border, just as yourself. You know that there are accidents when immigrants die." (Id. at
21 75:6-14).

22 Plaintiffs' expert, Gerald Bretting, also testified that if the Dodge had a flat tire, it was not
23 completely flat more than 600 feet south of the collision. He also opined that he could not tell if the
24 tire was flat. (Pls. Exh. G at 65:4-15; 67:5-18). Defendant's expert opines that the tire marks left by
25 the Dodge indicate that Lopez attempted to negotiate the curve at a high rate of speed by cutting
26 across into the southbound lane. Significantly, the tire markings on the curve are "not consistent with
27 a vehicle traveling in the northbound lane and suddenly losing control, or driving on a completely
28 deflated tire." (Casteel Decl. ¶6, Bates 33). With respect to the physical evidence, Mr. Casteel also

1 testified that the absence of damage to the rims indicates that the Dodge had not traveled "any
2 significant distance on a deflated tire or tires before the collision near mile marker 42." (Id ¶8, Bates
3 34).

4       The Government argues that the totality of Plaintiffs' evidence fails to create a genuine issue
5 of material fact. See National Union Fire Ins. Co. v. Argonaut Ins. Co. 701 F.2d 95, 97 (9th Cir. 1983)
6 (a plaintiff cannot "expect the district court to draw inferences favorable to it when they are wholly
7 unsupported."). The Government argues that the court should not draw inferences in Plaintiffs' favor
8 because substantial undisputed evidence contradicts Lopez's view of the events and that the testimony
9 of Lopez is insufficient to create a genuine issue of material fact.

10       In general, "[c]redibility issues are appropriately resolved only after an evidentiary hearing or
11 full trial." SEC v. Korcorp Industries, 575 F.2d 692, 699 (9th Cir. 1978). Here, however, the evidence
12 provided by Lopez is insufficient to create a genuine issue of material fact. In short, Lopez testified
13 that he saw a vehicle parked by the road and partially hidden by branches. He could not identify the
14 body style or color of the vehicle, nor could he describe any individual standing near the vehicle.
15 Lopez did not see any individual deploy a spike strip and he never saw a spike strip in the roadway.
16 While he testified that he heard a popping noise, the Stinger CTDD is specifically designed to prevent
17 blowouts by deflating a tire in a regulated manner. (Ramos Dep. Exh. C at 59:23-60:10; Ramos Decl.
18 ¶5). Further, Agent Ramos testified that he had deployed CTDDs on about ten occasions and had
19 never experienced a vehicle's tire pop or blow out, and he did not observe any driver losing control
20 after the deployment of a spike strip.[3] (Ramos Decl. ¶6). When asked how his tires deflated, Lopez
21 testified that he "imagined . . . that they [the border patrol] had flattened them." Moreover, when
22 asked how he "imagined" that, Lopez stated that he lived on the border. Such "imagination" of what
23 may have occurred fails to create a genuine issue of material fact.

24       While Plaintiffs suffered a great tragedy, the evidence presented by Plaintiffs fails to raise a
25 genuine issue of material fact. A factual dispute is genuine where "the evidence is such that a
26 reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 249-250.

---

[3] The court notes that Plaintiffs fail to cite any evidence indicating that a CTDD causes blowouts. The only evidence before the court indicates that the CTDD prevents blowouts, and allows for a gradual and continuous deflation of the tire.

1  Where evidence is only "colorable" or "not significantly probative," summary judgment may be
2  granted. Id. In the Ninth Circuit, opposition evidence must be such that it could cause reasonable
3  persons to disagree on whether the facts claimed by the moving party are true "enough to require a
4  jury or judge to resolve the parties' differing versions of the truth." Aydin Corp. v. Loral Corp., 718
5  F.2d 897, 902 (9th Cir. 1983). The court concludes that the quality and sufficiency of the evidence
6  presented by Plaintiffs is simply insufficient to create a genuine issue of material fact.

     In sum, the court grants the motion to dismiss the negligence claim as the discretionary function exception of the FTCA bars Plaintiffs' claims and, alternatively, grants the motion for summary judgment in favor of Defendant, and against Plaintiffs, on the negligence claim. The Clerk of Court is instructed to enter judgment in favor of Defendant, and against Plaintiffs, on all claims and to close the file.

**IT IS SO ORDERED.**

DATED: October 21, 2010

_____
Hon. Jeffrey T. Miller
United States District Judge

cc:      All parties